E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ERIC C. SCHMALE
SARAH E. EDWARDS
Trial Attorneys
United States Department of Justice
Fraud Section, Criminal Division
300 N. Los Angeles St., Suite 2001
Los Angeles, California 90012
Telephone:   (202) 880-2251
E-mail:   eric.schmale2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　　　v.<br><br>PETROS FICHIDZHYAN,<br><br>　　　　　Defendant. | No. CR 2:24-CR-348-SVW<br><br>PLEA AGREEMENT FOR DEFENDANT PETROS FICHIDZHYAN |

1. This constitutes the plea agreement between PETROS FICHIDZHYAN ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") and the Fraud Section of the Criminal Division of the United States Department of Justice (collectively with the USAO, "the United States") in the above-captioned case. This agreement is limited to the United States and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

//

//

//

DEFENDANT'S OBLIGATIONS

2.    Defendant agrees to:

a.    At the earliest opportunity requested by the United States and provided by the Court, appear and plead guilty to counts two, six, and fifteen of the indictment in United States v. Petros Fichidzhyan, CR No. 2:24-CR-348-SVW, which charge defendant with health care fraud in violation of 18 U.S.C. § 1347, aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), and concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

b.    Not contest facts agreed to in this agreement.

c.    Abide by all agreements regarding sentencing contained in this agreement.

d.    Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.    Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.    Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.    Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.    Defendant agrees that any and all criminal debt ordered by the Court will be due in full and immediately.  The government is not precluded from pursuing, in excess of any payment

schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

i. Complete the Financial Disclosure Statement on a form provided by the United States and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the United States by either email at usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial Litigation Section at 300 North Los Angeles Street, Suite 7516, Los Angeles, CA 90012. Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j. Authorize the United States to obtain a credit report upon returning a signed copy of this plea agreement.

k. Consent to the United States inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

l. Defendant understands and acknowledges that as a result of pleading guilty pursuant to this agreement, defendant will be excluded from Medicare, Medicaid, and all Federal health care programs. Defendant agrees to complete and execute all necessary documents provided by the United States Department of Health and Human Services, or any other department or agency of the federal government, to effectuate this exclusion within 60 days of receiving the documents. This exclusion will not affect defendant's right to apply for and receive benefits as a beneficiary under any Federal health care program, including Medicare and Medicaid.

1      3.    Defendant further agrees:

2           a.    To immediately and irrevocably forfeit, on behalf of

3  defendant and any entity in which defendant has held an ownership

4  interest or has served as an officer, director, manager, partner,

5  trustee, or other representative (which entities include, without

6  limitation, MJ Home Health Services, Inc.; Healthy Life Hospice,

7  Inc.; Prayer of Hope Hospice; Dynamic Hospice Care, Inc.; House of

8  Angels Hospice, Inc.; 10027 Commerce Ave, LLC; 10029 Commerce Ave,

9  LLC; 18808 Lull Street, LLC; and the 2022 Danielyan Family Revocable

10 Trust) to the United States of America all right, title, and interest

11 of defendant in and to any and all monies, properties, and/or assets

12 of any kind, derived from or acquired as a result of the illegal

13 activity to which defendant is pleading guilty, specifically

14 including, but not limited to, the following:

15           i.    $75,447.75 in funds seized from Banc of

16 California account number ending in x8303;

17           ii.   $2,626,324.73 in funds seized from Bank of

18 California account ending in x9860;

19           iii.  The real property located at 16817 Rayen Street,

20 Northridge, California, Assessor's Parcel Number 2688-027-001;

21           iv.   The real property located at 17404 San Fernando

22 Mission Boulevard, Granada Hills, California, Assessor's Parcel

23 Number 2712-005-012;

24           v.    $218,571.07 in funds seized from Chase Bank

25 Account ending in x8151;

26           vi.   One 2019 Mercedes-Benz AMG GT63 S, Vehicle

27 Identification Number WDD7X8KB0KA006620;

28

4

vii. The real property located at 5444 Shannon Valley Road, Acton, California, Assessor's Parcel Number 3216-014-044;

viii.    The real property located at 10027 - 10029 Commerce Avenue, Tujunga, California, Assessor's Parcel Numbers 2568-008-023 and 2568-008-022; and

ix.    The real property located at 18808 Lull Street, Reseda, California, Assessor's Parcel Number 2103-016-034 (collectively, the "Forfeitable Property").

b.    To deliver to the undersigned Trial Attorney, within fourteen (14) calendar days of defendant's execution of this plea agreement, notarized releases in the form of Exhibit A attached to this agreement, or a substantially similar form, executed by Syuzanna Danielyan, waiving her right to contest the forfeiture of the Forfeitable Property in which she has an interest.

c.    To the Court's entry of an order of forfeiture at or before sentencing with respect to the Forfeitable Property and to the forfeiture of the property.

d.    That the Preliminary Order of Forfeiture shall become final as to the defendant upon entry.

e.    To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Property, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

f.    Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Property.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Property on behalf

of himself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Property. Defendant further waives any and all notice requirements of 18 U.S.C. § 983(a)(1)(A).

g.    Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Property.

h.    Not to claim that reasonable cause to seize the Forfeitable Property was lacking.

i.    To prevent the transfer, sale, destruction, or loss of the Forfeitable Property to the extent defendant has the ability to do so.

j.    That forfeiture of Forfeitable Property shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

k.    With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture sentencing, and incorporation of the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Property in any proceeding on any grounds including, without limitation, that the forfeiture constitutes an excessive fine or punishment. Defendant acknowledges that forfeiture of the Forfeitable Property is part of the sentence that may be imposed in this case and waive any failure by the Court

to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty plea.

THE UNITED STATES' OBLIGATIONS

4.    The United States agrees to:

a.    Not contest facts agreed to in this agreement.

b.    Abide by all agreements regarding sentencing contained in this agreement.

c.    At the time of sentencing, move to dismiss the remaining counts of the indictment as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

d.    At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

e.    Recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range plus the mandatory consecutive sentence of 24 months' imprisonment on count six, provided that the offense level used by the Court to determine that range is 28 or higher and provided that the Court does not depart downward in offense level or criminal history category.  For purposes of this agreement, the low

end of the Sentencing Guidelines range is that defined by the

Sentencing Table in U.S.S.G. Chapter 5, Part A.

<u>NATURE OF THE OFFENSES</u>

5.   Defendant understands that for defendant to be guilty of the crime charged in count two, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, the following must be true: (a) defendant knowingly and willfully executed a scheme or plan to defraud a health care benefit program, or a scheme or plan to obtain money or property owned by or under the custody or control of a health care benefit program by means of material false or fraudulent pretenses, representations, or promises; (b) defendant acted with the intent to defraud, that is, the intent to deceive and cheat; (c) Medicare was a health care benefit program; and (d) the scheme or plan was executed in connection with the delivery of or payment for health care benefits, items, or services.

6.   Defendant understands that for defendant to be guilty of the crime charged in count six, that is, aggravated identity theft, in violation of Title 18, United States Code, Section 1028A(a)(1), the following must be true: (a) defendant knowingly transferred, possessed, or used, without legal authority, a means of identification of another person or a false identification document; and (b) defendant knew that the means of identification belonged to a real person; and (c) defendant did so during and in relation to the commission of a felony, namely, health care fraud.

7.   Defendant understands that for defendant to be guilty of the crime charged in count fifteen, that is, concealment money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), the following must be true: (a) defendant conducted

a financial transaction involving property that represented the proceeds of health care fraud; (b) defendant knew that the property represented the proceeds of some form of unlawful activity; and (c) defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

PENALTIES AND RESTITUTION

8.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1347, is: 10 years' imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.  Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1028A(a)(1), is: two years imprisonment; a one-year period of supervised release; $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), is: 20 years' imprisonment; a three-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

9.    Defendant also understands that the statutory mandatory minimum sentence that the Court must impose for a violation of Title 18, United States Code, Section 1028A, as charged in count six of the indictment, is a two-year term of imprisonment, which must run

9

consecutive to any other sentence of imprisonment, and a mandatory special assessment of $100.

10.  Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 32 years' imprisonment; a three-year period of supervised release; a fine of $1,000,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $300.  Defendant understands that there is case law suggesting that the term of supervised release on count six could be imposed to run consecutively to the terms of supervised release on the other counts.  While the United States does not intend to seek a consecutive term of supervised release, defendant understands that if the Court were to impose a consecutive term of supervised release, the maximum term of supervised release for all of the counts of conviction would be four years, rather than three years as stated in the text above.

11.  Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offenses to which defendant is pleading guilty.  Defendant agrees that, in return for the United States' compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offenses to which defendant is pleading guilty and in amounts greater than those alleged in the counts to which defendant is pleading guilty.  In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offenses to which defendant is pleading guilty; and (b) any counts

dismissed and charges not prosecuted pursuant to this agreement as well as all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with those counts and charges.  The parties currently believe that the applicable amount of restitution is approximately $17,129,060, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

12.  Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

13.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated

11

collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

14.    Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the convictions in this case make it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his convictions on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his pleas may entail, even if the consequence is automatic removal from the United States.

## FACTUAL BASIS

15.    Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty and that the Forfeitable Property was derived from or acquired as a result of the illegal activity described herein.  Defendant and the United States agree to the statement of facts below and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 17 below but is not meant to be a complete recitation of all facts relevant to the underlying

criminal conduct or all facts known to either party that relate to that conduct:

INDIVIDUALS

Defendant PETROS FICHIDZHYAN, also known as ("aka") "Peter Fichidzhyan," was a resident of Granada Hills, California.

B.L. was a citizen of Russia who was issued a United States visa in or around April 2010, and departed the United States on or about September 29, 2010.

D.G. was a citizen of Russia who was issued a United States visa in or around June 2013, and departed the United States on or about September 18, 2013.

A.M. was a citizen of Russia who was issued a United States visa in or around February 2018, and departed the United States on or about May 30, 2019.

I.S. was a citizen of Ukraine who was issued a United States visa in or around June 2010, and departed the United States on or about September 10, 2010.

Physician 1 was a medical doctor licensed to practice in California.

Physician 2 was a medical doctor licensed to practice in California who died on or about March 29, 2019.

Physician 3 was a medical doctor licensed to practice in California who died on or about January 21, 2022.

ENTITIES

MJ Home Health Services, Inc. ("MJ Home Health") was a home health care agency located at 6450 Bellingham Avenue, Suite B, North Hollywood, California.  FICHIDZHYAN owned, controlled, and operated MJ Home Health.

1    Healthy Life Hospice, Inc. ("Healthy Life") was a purported

2  hospice company that used addresses at 12509 Oxnard Street, Suite

3  215, North Hollywood, California, and 6422 Bellingham Avenue, No.

4  201, Los Angeles, California.  Beginning in or around April 2019,

5  B.L. was purportedly the sole owner of Healthy Life, according to

6  records submitted to the State of California and Medicare.

7    Prayer of Hope Hospice ("Prayer of Hope") was a purported

8  hospice company that used an address at 11336 Camarillo Street, Unit

9  305, West Toluca Lake, California.  Beginning in or around February

10  2020, D.G. was purportedly the Chief Executive Officer ("CEO"), Chief

11  Financial Officer ("CFO"), and Secretary of Prayer of Hope, and

12  beginning in or around March 2020, A.M. was purportedly the sole

13  owner, and beginning in or around April 2020, A.M. purportedly became

14  the CEO, CFO, and Secretary of Prayer of Hope, according to records

15  submitted to the State of California and Medicare.

16    Dynamic Hospice Care, Inc. ("Dynamic") was a purported

17  hospice company that used addresses at 10319 Norris Avenue, Suite C,

18  Pacoima, California, and 5958 Vineland Avenue, Unit D, North

19  Hollywood, California.  Beginning in or around July 2020, I.S. was

20  purportedly the CEO, CFO, and Secretary of Dynamic, according to

21  records submitted to the State of California.  Beginning no later

22  than March 2021, I.S. was purportedly the sole owner of Dynamic,

23  according to records submitted to Medicare.

24    House of Angels Hospice, Inc. ("House of Angels") was a

25  purported hospice company that used an address at 5627 Sepulveda

26  Boulevard, Suite 218, Van Nuys, California.  Beginning in or around

27  April 2021, codefendant Juan Esparza owned, controlled, and operated

28  House of Angels.

RESIDENCES

The Winnetka Residence was a single-family residence located in Winnetka, California.

The Northridge Residence was a single-family residence located in Northridge, California.

THE MEDICARE PROGRAM

Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."  Each beneficiary was given a unique health insurance claim number.

Hospices, home health agencies, physicians, and other health care providers who provided services to beneficiaries that were reimbursed by Medicare were referred to as Medicare "providers."

To participate in Medicare, Medicare required prospective providers to be licensed by a state or local agency.  After obtaining the applicable license, Medicare required prospective hospice and home health providers to submit an application in which the prospective provider agreed to, among other things, not submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity. If Medicare approved a provider's application, Medicare assigned the

provider a Medicare "provider number," which was used for the processing and payment of claims submitted by the provider.

A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

HOSPICE SERVICES

Medicare coverage for hospice services was limited to situations in which: (1) a physician certified that the beneficiary was terminally ill; and (2) the beneficiary signed an election form statement choosing hospice care instead of other Medicare benefits. Medicare considered a beneficiary to be "terminally ill" if the beneficiary's life expectancy was six months or less, if the beneficiary's illness ran its normal course.

Hospice services reimbursed by Medicare were palliative in nature (also referred to as "comfort care") and included, but were not limited to, medications to manage pain symptoms, necessary medical equipment, and bereavement services to surviving family members.

Once a beneficiary chose hospice care, Medicare would not cover treatment intended to cure the beneficiary's terminal illness. The beneficiary had to sign and date an election form documenting this choice.  The election form had to include an acknowledgement that the beneficiary had been given a full understanding of hospice care, particularly the palliative rather than curative nature of treatment, and an acknowledgement that the beneficiary understood that certain Medicare services were waived by the election.  The election form also identified the attending physician for the beneficiary, which is the qualified medical provider deemed to have

16

the most significant role in the determination and delivery of the beneficiary's medical care in hospice.

To obtain payment from Medicare for hospice services, the hospice provider must submit a claim for payment. Generally, such claims must set forth, among other things: the beneficiary's name and unique Medicare identification number; the type of services provided to the beneficiary; the date(s) that the services were provided; and the name and National Provider Identifier ("NPI") or Unique Physician Identification Number of the attending physician.

THE HOSPICE FRAUD SCHEME

Beginning no later than in or around February 2019, and continuing through at least in or around January 2023, in Los Angeles County, within the Central District of California, and elsewhere, FICHIDZHYAN knowingly engaged in a scheme with others, including codefendants Juan Esparza and Karpis Srapyan, to defraud Medicare.

FICHIDZHYAN and his coschemers obtained the names, dates of birth, social security numbers, and other personal identifying information of foreign persons who at one time had been present in the United States on U.S. visas, but had departed the United States (the "Impersonated Identities"), including, among others, B.L., D.G., A.M., and I.S.

FICHIDZHYAN and his coschemers attempted to obtain and obtained means of identification for the Impersonated Identities.

FICHIDZHYAN and his coschemers established control over hospice entities, including House of Angels, Healthy Life, Prayer of Hope, and Dynamic (collectively, the "Sham Hospices").

FICHIDZHYAN and his coschemers represented that the Impersonated Identities were the owners and officers of Healthy Life,

1  Prayer of Hope, and Dynamic, including by submitting the Impersonated

2  Identities' names and identifying information to the California

3  Secretary of State and Medicare.

4           FICHIDZHYAN and his coschemers established bank accounts in

5  the names of the Impersonated Identities and Sham Hospices,

6  identifying the Impersonated Identities as signatories on the

7  accounts.

8           FICHIDZHYAN and his coschemers used the Impersonated

9  Identities to sign property leases, including codefendant Karpis

10 Srapyan falsely presenting himself as B.L. and signing B.L.'s name on

11 office leases for Dynamic and Healthy Life.

12          FICHIDZHYAN and his coschemers obtained, retained, and used

13 cell phones, cell phone numbers, and cell phone services in the names

14 of the Impersonated Identities.  This includes a phone number ending

15 in 4617 which FICHIDZHYAN falsely listed as I.S.'s cell phone number

16 on the customer profile for a Dynamic bank account, and which

17 FICHIDZHYAN used to call CMS while posing as I.S. to make inquiries

18 regarding Dynamic.  FICHIDZHYAN also sent text messages to

19 codefendant Esparza requesting that codefendant Esparza pay the phone

20 bill for I.S.'s cell phone.

21          FICHIDZHYAN and his coschemers funded the Sham Hospices,

22 including in or around February 2020 FICHIDZHYAN sent money orders

23 from MJ Home Health to pay for Prayer of Hope's office rent, and in

24 or around 2021 FICHIDZHYAN provided funds via checks from MJ Home

25 Health to House of Angels.

26          FICHIDZHYAN and his coschemers maintained and accessed

27 documents and information associated with the Impersonated Identities

28 and Sham Hospices at common business and residential addresses,

including keeping documents associated with Prayer of Hope, Dynamic, D.G., and A.M. at House of Angels' address, and keeping a House of Angels checkbook at MJ Home Health's address.

FICHIDZHYAN and his coschemers maintained at the Winnetka and Northridge Residences documents, cell phones, and objects associated with Prayer of Hope, Dynamic, Healthy Life, and the Impersonated Identities, including driver's licenses, social security cards, cell phones, password lists, forged initials, and checkbooks.

FICHIDZHYAN and his coschemers accessed from the Northridge Residence email and bank accounts associated with D.G., B.L., A.M., and Prayer of Hope, as well as other bank accounts that received funds derived from the scheme.

Between no later than in or around July 2019 and continuing to at least in or around January 2023, FICHIDZHYAN and his coschemers submitted and caused to be submitted false and fraudulent claims to Medicare on behalf of the Sham Hospices, seeking payment for purported hospice services on behalf of, and using the names and personal identifying information of, Medicare beneficiaries who in fact were ineligible for hospice services covered by Medicare, not terminally ill, and had never elected nor received hospice care from the Sham Hospices, including in some instances claiming that the same beneficiary received services from multiple Sham Hospices.

FICHIDZHYAN and his coschemers misappropriated the names and personal identifying information of doctors -- including doctors listed in MJ Home Health patient records, Physician 1 and deceased Physicians 2 and 3 -- for use in the Sham Hospices' claims to Medicare.  This included in the submission of false and fraudulent claims for payment for purported hospices services, knowing and

1  intending that Medicare would rely on that information as purportedly

2  reflecting a physician's determination that the hospice services

3  billed were necessary and appropriate for the beneficiaries in

4  determining whether to reimburse the provider for the claim.

5  Beginning no later than in or around February 2019, and

6  continuing to at least in or around January 2023, in Los Angeles

7  County, within the Central District of California, and elsewhere,

8  FICHIDZHYAN together with others, each aiding and abetting one

9  another, knowingly, willfully, and with intent to defraud, executed

10  and willfully caused to be executed a scheme and artifice: (a) to

11  defraud Medicare, a health care benefit program, as to material

12  matters in connection with the delivery of and payment for health

13  care benefits, items, and services; and (b) to obtain money from

14  Medicare, a health care benefit program, by means of materially false

15  and fraudulent pretenses, representations, and promises and the

16  concealment of material facts, in connection with the delivery of and

17  payment for health care benefits, items, and services.

18  Specifically, as charged in count two of the Indictment, on

19  or about December 19, 2019, in Los Angeles County, within the Central

20  District of California, and elsewhere, FICHIDZHYAN, together with

21  others, each aiding and abetting one another, knowingly and willfully

22  executed and willfully caused to be executed the fraudulent scheme

23  described above by submitting and causing to be submitted to Medicare

24  a false and fraudulent claim for payment in the amount of $2,000 for

25  hospice services purportedly provided by Healthy Life to beneficiary

26  M.G.

27  During and in relation to this felony violation of Title

28  18, United States Code, Section 1347, as charged in count two of the

Indictment, on or about December 19, 2019, FICHIDZHYAN, together with others, each aiding and abetting one another, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification of another person that FICHIDZHYAN knew belonged to another person, specifically, Physician 1's name and NPI, which were used in submitting the Medicare claim for beneficiary M.G.

In total, as a result of FICHIDZHYAN and his coschemers' false and fraudulent claims for hospice services that were neither medically necessary nor rendered, Medicare paid the Sham Hospices approximately $15,992,154. This includes approximately $4,483,840 in payments to Healthy Life (between July 2019 and April 2023), $3,776,040 in payments to Prayer of Hope (between June 2020 and July 2023), $6,345,776 in payments to Dynamic (between November 2020 and July 2023), and $1,386,497 in payments to House of Angels (between July 2021 and January 2023).

<u>THE MONEY LAUNDERING CONDUCT</u>

After FICHIDZHYAN and his coschemers fraudulently obtained payments from Medicare into bank accounts associated with the Sham Hospices as described above, FICHIDZHYAN and others would transfer and cause to be transferred proceeds of the health care fraud scheme between and among numerous assets and bank accounts — including, but not limited to, assets, accounts, and credit cards in the names of the Sham Hospices, MJ Home Health, and the Impersonated Identities — to conceal the nature, location, source, ownership, and control of the fraud proceeds.

Specifically, on or about March 30, 2022, in Los Angeles County, within the Central District of California, and elsewhere,

1  FICHIDZHYAN, together with others, each aiding and abetting one

2  another, knowingly conducted and willfully caused to be conducted a

3  financial transaction involving property that represented the

4  proceeds of health care fraud, in violation of Title 18, United

5  States Code, Section 1347, specifically, the transfer of $75,500 from

6  an account at Chase Bank ending in x9283 in the name of Prayer of

7  Hope, on which A.M. was the sole listed signatory, by means of check

8  into an account at Banc of California ending in x8303 in the name of

9  MJ Home Health, on which FICHIDZHYAN was the sole signatory,

10 affecting interstate commerce, knowing the property involved

11 represented the proceeds of some form of unlawful activity, namely,

12 health care fraud, in violation of Title 18, United States Code,

13 Section 1347, and knowing that the transaction was designed in whole

14 and in part to conceal and disguise the nature, location, source,

15 ownership, and control of the proceeds of said specified unlawful

16 activity, as charged in count fifteen of the Indictment.

17     FICHIDZHYAN and his coschemers also transferred fraudulent

18 proceeds, including in individual transactions over $10,000, from

19 accounts in the names of the Sham Hospices to accounts in their own

20 names or to purchase assets, including vehicles and real estate, in

21 their own names.

22     For instance, on or about March 10, 2022, FICHIDZYAN

23 electronically transferred $99,900 in fraud proceeds from an account

24 at Banc of California ending in x5413 in the name of Dynamic, on

25 which I.S. was the sole listed signatory, to a mortgage company for a

26 mortgage payment on a residence owned by FICHIDZHYAN.

27     In total, FICHIDZHYAN personally received nearly $7 million

28 of the proceeds from the hospice fraud scheme.  This includes nearly

22

$1.7 million paid directly from the Sham Hospices to FICHIDZHYAN and his business MJ Home Health.  It further includes more than $5.3 million in transfers to his personal bank accounts and MJ Home Health bank accounts laundered through twelve shell and third-party bank accounts.

THE HOME HEALTH CARE SCHEME

Home health care was supportive health care provided to patients in their homes.  Home health care was prescribed by a treating physician to a patient if the patient had developed an illness or injury that required skilled care, but not at the level provided by an acute facility such as a hospital or at a skilled nursing facility.

To qualify for the Medicare home health benefit, among other requirements, a beneficiary must: (1) have been confined to his or her home; (2) have been under the care of a physician; (3) have received services under a CMS Form 485 Home Health Certification and Plan of Care ("485") established and periodically reviewed by a physician; (4) have had a face-to-face encounter with a physician or approved provider within a specified period of time from the start of home health care; and (5) need skilled nursing care on an intermittent basis, physical therapy, speech-language pathology, or have a continuing need for occupational therapy.

During the years 2019-2020, FICHIDZHYAN falsely documented and caused to be documented, for purposes of obtaining payment from Medicare on home health care claims for MJ Home Health, that Physician 1 had certified and recertified MJ Home Health patients as confined to their homes, that Physician 1 had authorized their plans of care, and that these patients remained under the care of Physician

23

1, and that Physician 1 was the attending physician for MJ Home Health patients.

When confronted by Physician 1 as to these falsities, FICHIDZHYAN agreed to compensate Physician 1 for the fraudulent use of Physician 1's identifying information on Medicare documentation and claims.  FICHIDZHYAN ultimately paid Physician 1 $11,000 in an attempt to cover up his fraudulent use of Physician 1's identifying information in MJ Home Health files.

From 2019-2020, Medicare paid MJ Home Health approximately $1,136,906 for claims that falsely listed Physician 1 as the attending physician, which claims Medicare would not have paid if it had known that Physician 1 was not in fact the attending physician.

<u>SENTENCING FACTORS</u>

16.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate between the mandatory 24-month sentence up to the maximum set by statute for the crimes of conviction.

17.  Defendant and the United States agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 6 | U.S.S.G.§ 2S1.1(a)(1), |
| | | U.S.S.G. § 2B1.1(a) |
| Actual Loss of More than $9,500,000 but Less than $25,000,000: | +20 | U.S.S.G. § 2B1.1(b)(1)(K) |
| Federal Health Care Offense with Loss of More than $7,000,000 but Less than $20,000,000: | +3 | U.S.S.G. § 2B1.1(b)(7) |
| Sophisticated Means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Concealment Money Laundering: | +2 | U.S.S.G. § 2S1.1(b)(2) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1 |
| Total Offense Level: | 30 | |

The United States will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 4(d) are met and if defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below.  Subject to paragraph 31 below, defendant and the United States agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed, except that the parties agree they may argue for or contest the application of a two-level reduction under U.S.S.G. § 4C1.1.  Defendant agrees, however, that if, after signing this agreement but prior to sentencing, defendant were to commit an act, or the United States were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the United States, constituted obstruction of

25

justice within the meaning of U.S.S.G. § 3C1.1, the United States
would be free to seek the enhancement set forth in that section and
to argue that defendant is not entitled to a downward adjustment for
acceptance of responsibility under U.S.S.G. § 3E1.1.  Defendant
understands that the Court must sentence defendant to a term of 24
months' imprisonment on count six, which must run consecutive to any
term of imprisonment imposed for counts two and fifteen.

18.  Defendant understands that there is no agreement as to
defendant's criminal history or criminal history category.

19.  Defendant and the United States reserve the right to argue
for a sentence outside the sentencing range established by the
Sentencing Guidelines based on the factors set forth in 18 U.S.C.
§ 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

20.  Defendant understands that by pleading guilty, defendant
gives up the following rights:

a.  The right to persist in a plea of not guilty.

b.  The right to a speedy and public trial by jury.

c.  The right to be represented by counsel -- and if
necessary have the Court appoint counsel -- at trial.  Defendant
understands, however, that, defendant retains the right to be
represented by counsel -- and if necessary have the Court appoint
counsel -- at every other stage of the proceeding.

d.  The right to be presumed innocent and to have the
burden of proof placed on the government to prove defendant guilty
beyond a reasonable doubt.

e.  The right to confront and cross-examine witnesses
against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## WAIVER OF APPEAL OF CONVICTION

21.    Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

22.    Defendant agrees that, provided the Court imposes a total term of imprisonment within or below the range corresponding to an offense level of 30 and the criminal history category calculated by the Court plus the mandatory consecutive sentence of 24 months' imprisonment on count six, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court,

provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, provided it requires payment of no more than $17,129,060; (f) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

23.  Defendant also gives up any right to bring a post-conviction collateral attack on the convictions or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

24.  The United States agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment within or above the range corresponding to an offense level of 28 and the criminal history category calculated by the Court plus the mandatory

consecutive sentence of 24 months' imprisonment on count six, the United States gives up its right to appeal any portion of the sentence, with the exception that the United States reserves the right to appeal the amount of restitution ordered if that amount is less than $17,129,060.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

25. Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the United States will be relieved of all of its obligations under this agreement; and (b) should the United States choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## RESULT OF VACATUR, REVERSAL, OR SET-ASIDE

26. Defendant agrees that if any count of conviction is vacated, reversed, or set aside, or any enhancement imposed by the Court to which the parties stipulated in this agreement is vacated or set aside, the United States may: (a) ask the Court to resentence defendant on any remaining counts of conviction, with both the United

States and defendant being released from any stipulations regarding sentencing contained in this agreement, (b) ask the Court to void the entire plea agreement and vacate defendant's guilty pleas on any remaining counts of conviction, with both the United States and defendant being released from all their obligations under this agreement, or (c) leave defendant's remaining convictions, sentence, and plea agreement intact.  Defendant agrees that the choice among these three options rests in the exclusive discretion of the United States.

EFFECTIVE DATE OF AGREEMENT

27.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and a Trial Attorney for the U.S. Department of Justice.

BREACH OF AGREEMENT

28.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and a Trial Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the United States may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the United States to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the United States in writing.  If the United States declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas,

and (b) the United States will be relieved of all its obligations under this agreement.

29. Following the Court's finding of a knowing breach of this agreement by defendant, should the United States choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then:

a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c. Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

1    <u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

2    <u>OFFICE NOT PARTIES</u>

3       30. Defendant understands that the Court and the United States

4    Probation and Pretrial Services Office are not parties to this

5    agreement and need not accept any of the United States' sentencing

6    recommendations or the parties' agreements to facts or sentencing

7    factors.

8       31. Defendant understands that both defendant and the United

9    States are free to: (a) supplement the facts by supplying relevant

10   information to the United States Probation and Pretrial Services

11   Office and the Court, (b) correct any and all factual misstatements

12   relating to the Court's Sentencing Guidelines calculations and

13   determination of sentence, and (c) argue on appeal and collateral

14   review that the Court's Sentencing Guidelines calculations and the

15   sentence it chooses to impose are not error, although each party

16   agrees to maintain its view that the calculations in paragraph 17 are

17   consistent with the facts of this case. While this paragraph permits

18   both the United States and defendant to submit full and complete

19   factual information to the United States Probation and Pretrial

20   Services Office and the Court, even if that factual information may

21   be viewed as inconsistent with the facts agreed to in this agreement,

22   this paragraph does not affect defendant's and the United States'

23   obligations not to contest the facts agreed to in this agreement.

24       32. Defendant understands that even if the Court ignores any

25   sentencing recommendation, finds facts or reaches conclusions

26   different from those agreed to, and/or imposes any sentence up to the

27   maximum established by statute, defendant cannot, for that reason,

28   withdraw defendant's guilty pleas, and defendant will remain bound to

1  fulfill all defendant's obligations under this agreement.  Defendant

2  understands that no one -- not the prosecutor, defendant's attorney,

3  or the Court -- can make a binding prediction or promise regarding

4  the sentence defendant will receive, except that it will be between

5  the statutorily mandated sentence and the statutory maximum.

6                         <u>NO ADDITIONAL AGREEMENTS</u>

7       33.  Defendant understands that, except as set forth herein,

8  there are no promises, understandings, or agreements between the

9  United States and defendant or defendant's attorney, and that no

10  additional promise, understanding, or agreement may be entered into

11  unless in a writing signed by all parties or on the record in court.

12          <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

13       34.  The parties agree that this agreement will be considered

14  part of the record of defendant's guilty plea hearing as if the

15  entire agreement had been read into the record of the proceeding.

16  AGREED AND ACCEPTED

17  UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
18  CALIFORNIA

19  E. MARTIN ESTRADA
    United States Attorney

20

21

22  ERIC C. SCHMALE                              1/4/25
    SARAH E. EDWARDS                     _____
    Trial Attorneys                     Date

23

24  PETROS FICHIDZHYAN                           1-3-25
    Defendant                           _____
                                        Date
25

26  ALEX R. KESSEL                           JAN 3, 2025
    Attorney for Defendant PETROS        _____
27  FICHIDZHYAN                          Date

28

                              33

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____        1-3-25
PETROS PICHIDZHYAN                        Date
Defendant

34

1       CERTIFICATION OF DEFENDANT'S ATTORNEY

2           I am PETROS FICHIDZHYAN's attorney.  I have carefully and

3       thoroughly discussed every part of this agreement with my client.

4       Further, I have fully advised my client of his rights, of possible

5       pretrial motions that might be filed, of possible defenses that might

6       be asserted either prior to or at trial, of the sentencing factors

7       set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8       provisions, and of the consequences of entering into this agreement.

9       To my knowledge: no promises, inducements, or representations of any

10      kind have been made to my client other than those contained in this

11      agreement; no one has threatened or forced my client in any way to

12      enter into this agreement; my client's decision to enter into this

13      agreement is an informed and voluntary one; and the factual basis set

14      forth in this agreement is sufficient to support my client's entry of

15      guilty pleas pursuant to this agreement.

16

17      ALEX R. KESSEL                          Date    JAN 3, 2025
        Attorney for Defendant PETROS
18      FICHIDZHYAN

19

20

21

22

23

24

25

26

27

28

                                    35