BILAL A. ESSAYLI
Acting United States Attorney
JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division
SARAH E. EDWARDS
ALLISON L. MCGUIRE
MICHAEL BACHARACH
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section
    300 N. Los Angeles Street, Suite 2001
    Los Angeles, California 90012
    Telephone: (202) 913-4782
    E-mail: Sarah.Edwards@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:24-CR-348-SVW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM REGARDING DEFENDANT JUAN CARLOS ESPARZA |
| v. | |
| JUAN CARLOS ESPARZA | Date: October 6, 2025 |
| Defendant. | Time: 11:00 a.m. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and the Fraud Section of the Criminal Division of the United States Department of Justice, hereby files its Sentencing Memorandum with respect to defendant Juan Carlos Esparza.

This Sentencing Memorandum is based upon the attached memorandum of points and authorities, the attached exhibits, the files and

records in this case, and such further evidence and argument as the Court may permit.

Dated: September 22, 2025          Respectfully submitted,

                                  BILAL A. ESSAYLI
                                  Acting United States Attorney

                                  JOSEPH T. MCNALLY
                                  Assistant United States Attorney
                                  Acting Chief, Criminal Division


                                  _____/s/_____
                                  SARAH E. EDWARDS
                                  ALLISON L. MCGUIRE
                                  MICHAEL BACHARACH
                                  Department of Justice Trial Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

2

**CONTENTS**

I.    INTRODUCTION..................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND.............................2

      A.    The Scheme.............................................2

      B.    Procedural Background..................................6

III.  GUIDELINES CALCULATION.......................................6

      A.    The Sentencing Guidelines Calculation Results in a
            Range of 51 - 63 Months' Imprisonment..................6

      B.    Guidelines on Which the Parties Agree..................7

            1.    Base Offense Level...............................7

            2.    Loss Amount......................................7

            3.    Federal Health Care Offense......................8

            4.    Means of Identification..........................8

            5.    Transactional Money Laundering...................8

            6.    Acceptance of Responsibility and Zero-Point
                  Offender.........................................9

      C.    Disputed Guidelines....................................9

            1.    Esparza Employed Sophisticated Means.............9

            2.    Esparza Was Not a Minor Participant.............14

IV.   SECTION 3553(a) FACTORS.....................................17

      A.    The Nature and Circumstances of Esparza's Extensive
            Fraud Warrants a 63-Month Guidelines Sentence.........18

      B.    Esparza's History and Characteristics Favor a 63-Month
            Guidelines Sentence...................................19

      C.    A Sentence of 63 Months' Imprisonment Is Necessary to
            Deter Health Care Fraud and Related Money Laundering..20

      D.    A Guidelines Sentence of 63 Months' Imprisonment
            Avoids Unwarranted Sentencing Disparities Among
            Defendants............................................23

V.    RESTITUTION.................................................23

VI.   CONCLUSION..................................................24

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Defendant Juan Carlos Esparza was a key member of a massive years-long hospice fraud and money laundering scheme that operated through impersonated identities, empty storefront offices, and sham corporations, ultimately defrauding Medicare of nearly $16 million. Esparza and his coschemers — who concealed their control of three of the sham hospices by placing them in the names of foreign nationals who had left the United States — obtained the identities of unwitting doctors and patients and used them to bill Medicare for hospice care that was never provided and was not needed.  Esparza owned the fourth sham hospice in his own name.  Esparza also obtained false identification documents for use in the scheme, signed forms lying to Medicare, and handled complaints from actual medical providers that were providing needed care to Medicare members to perpetuate the scheme.  Esparza and his coschemers then laundered the fraud proceeds through bank accounts in the names of impersonated identities and shell companies to conceal the nature and source of the funds. Esparza personally received or controlled at least $1,825,012 in fraudulent proceeds from the scheme.

As a result of his crimes, the United States recommends that the Court sentence Esparza to 63 months' imprisonment, followed by three years' supervised release, and a special assessment of $200 and order restitution of $1,825,012.  Such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and deter similar criminal conduct by Esparza and others.

1

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Scheme

Beginning in or around February 2019, and continuing through at least in or around January 2023, Esparza, Petros Fichidzhyan, and Karpis Srapyan knowingly engaged in a scheme with others to defraud Medicare.  Plea Agreement (ECF No. 187 ¶ 12) and Presentence Investigation Report ("PSR") (ECF No. 213 ¶¶ 25-64).

House of Angels Hospice, Inc. ("House of Angels") was a purported hospice company that, beginning in or around April 2021, Esparza owned, controlled, and operated.  Plea Agreement ¶ 12. During the time period of Esparza's ownership and control, House of Angels existed only as a storefront, had no legitimate patients, no legitimate employees, and provided no hospice services.  *Id*.

In addition to House of Angels, Esparza and his coschemers established control over additional hospice entities including Healthy Life Hospice, Inc. ("Healthy Life"), Prayer of Hope Hospice ("Prayer of Hope"), and Dynamic Hospice Care, Inc. ("Dynamic") (together with House of Angels, the "Sham Hospices").  PSR ¶ 51. Esparza and his coschemers also obtained the names, dates of birth, social security numbers, and other personal identifying information of foreign persons who at one time had been present in the United States on U.S. visas, but had departed the United States (the "Impersonated Identities"), including, among others, B.L., D.G., A.M., and I.S.  *Id*. ¶¶ 49-50.  They then represented that the Impersonated Identities were the owners and officers of Healthy Life, Prayer of Hope, and Dynamic and established bank accounts in the names of the Impersonated Identities and Sham Hospices, identifying

the Impersonated Identities as signatories on the accounts. *Id.* ¶¶ 52-53.

Between July 2019 and January 2023, Esparza and his coschemers submitted and caused to be submitted false and fraudulent claims to Medicare on behalf of the Sham Hospices, seeking payment for purported hospice services using the names and personal identifying information of Medicare beneficiaries who were not eligible for hospice, not terminally ill, and had never elected nor received hospice care from the Sham Hospices. *Id.* ¶ 59. Specifically, on or about December 19, 2019, Esparza, together with others, caused to be submitted to Medicare a false and fraudulent claim for payment in the amount of $2,000 for hospice services purportedly provided by Healthy Life to beneficiary M.G. ¶ 62.

Esparza was involved with the Sham Hospices as early as 2019. Bank records reflect that on a July 2019 credit card application, Esparza represented to a financial institution that he was a minister at Healthy Life Hospice, when Esparza has acknowledged that he was aware that Healthy Life was a sham. Exhibit A, September 22, 2025 Decl. of Special Agent Travis Pforr ("Sept. 22 Pforr Decl.") ¶ 4; Plea Agreement at ¶ 12. Text messages between Esparza and Fichidzhyan in late 2019 and early 2020 also include discussions of specific Medicare beneficiaries billed by the Sham Hospices. Id. ¶ 12.

Esparza owned House of Angels, and he was involved in all of the Sham Hospices and the use of the Impersonated Identities. Witnesses recalled seeing Esparza at the storefronts associated with Dynamic and House of Angels. Exhibit B, ECF 121-1, Nov. 27, 2024 Decl. of Special Agent Travis Pforr ("Nov. 27 Pforr Decl.") ¶¶ 16, 23.

3

Esparza and Fichidzhyan discussed, via text message, individual Medicare beneficiaries for whom each of the Sham Hospices billed. Nov. 27 Pforr Decl. ¶¶ 11, 14, 19, 22 (Esparza and Fichidzhyan discussed at least 10 billed Healthy Life beneficiaries; one Prayer of Hope beneficiary; four Dynamic beneficiaries; and five House of Angels beneficiaries). Esparza, at Fichidzhyan's request, also contacted an individual who made fake identification documents and provided that individual with I.S.'s name and identifying information and placed an order for a fake driver's license in I.S.'s name, but using Esparza's home address. Sept. 22 Pforr Decl. ¶¶ 5-6; Exhibit C, Text Messages Between Fichidzhyan and Esparza. Esparza also worked to obtain false identification documents for at least two other Impersonated Identities, D.G. and A.M., and he and his coschemers also used Esparza's address as the purported address for at least two more of the Impersonated Identities. *Id.* ¶¶ 8, 11. When Esparza was arrested by the Glendale police in June 2020, he was in possession of mail for one of the Impersonated Identities, I.P., and lied to police, stating that I.P was a friend of his who lived in the area when in fact I.P. left the United States in 2013. *Id.* ¶ 10.

In total, as a result of Esparza's and his coschemers' false and fraudulent claims for hospice services that were medically unnecessary and never provided, Medicare paid the Sham Hospices approximately $15,992,154. PSR ¶ 63. This included approximately $1,386,497 in payments to House of Angels (between July 2021 and January 2023). *Id.* Esparza was the signatory on the House of Angels bank account. Nov. 27 Pforr Decl. ¶ 20.

Esparza personally received or controlled at least $1,825,012 of the fraudulent proceeds. PSR ¶ 64. In addition to the Medicare

transfers to House of Angels that he controlled, Esparza received funds from Healthy Life, Dynamic, and Prayer of Hope; from an account in the name of D.G., one of the Impersonated Identities; from MK Messenger and Priority Physical Therapy, two shell companies used to launder the fraudulent proceeds; and from accounts controlled by Fichidzhyan.  Sept. 22 Pforr Decl. ¶ 13-15; Exhibit D, Esparza Fraud Proceeds.

After Esparza and his coschemers obtained fraudulent funds from Medicare, they worked with others to transfer and cause the transfer of those fraud proceeds between and among numerous assets and bank accounts — including, but not limited to, assets, accounts, and credit cards in the names of the Sham Hospices and the Impersonated Identities, as well as accounts in the names of shell entities — to conceal the nature, location, source, ownership, and control of the fraud proceeds.  PSR ¶ 65.

As part of the money laundering scheme, Esparza and his coschemers maintained materials associated with the Sham Hospices and Impersonated Identities at the Winnetka Residence and the Northridge Residence.  *Id.* ¶ 66.  These materials included lists of Impersonated Identities with their names, dates of birth, and social security numbers; driver's licenses and social security cards; mail; business registration statements for businesses purportedly owned by the Impersonated Identities; and bank documents, checkbooks, and credit and debit cards in the names of the Impersonated Identities.  *Id.* ¶ 66.

On or about February 10, 2022, Esparza knowingly conducted a financial transaction that he knew involved criminally derived property, specifically the proceeds of the hospice fraud scheme, when

he transferred $90,000 from the House of Angels bank account to a car dealership to purchase a vehicle. PSR ¶ 68.

### B.    Procedural Background

The grand jury indicted Esparza and his four codefendants on June 5, 2024. ECF No. 1. The grand jury charged Esparza with conspiracy to commit health care fraud (18 U.S.C. § 1349), four counts of health care fraud (18 U.S.C. § 1347), three counts of aggravated identity theft (18 U.S.C. § 1028A), conspiracy to launder money (18 U.S.C. § 1956(h)), and one count of transactional money laundering (18 U.S.C. § 1957). *Id*.

On June 30, 2025, Esparza signed a plea agreement (ECF No. 187), and on July 14, 2025, he entered his plea of guilty to Counts Two (health care fraud) and Twenty (transactional money laundering). ECF No. 193. The Court set Esparza's sentencing for October 6, 2025.[1]

## III. GUIDELINES CALCULATION

### A.    The Sentencing Guidelines Calculation Results in a Range of 51 – 63 Months' Imprisonment

The Sentencing Guidelines range is appropriately calculated as follows, consistent with the Plea Agreement (ECF No. 187, ¶ 14) and the Probation Office's calculation in the PSR (PSR ¶¶ 73-107):

| | | |
|---|---|---|
| Base Offense Level: | 6 | U.S.S.G. § 2S1.1(a)(1), U.S.S.G. § 2B1.1(a) |
| Loss of More than $1,500,000 but Less than $3,500,000: | +16 | U.S.S.G. § 2B1.1(b)(1)(I) |

---

[1] The remaining defendants in this case have also entered guilty pleas. Petros Fichidzhyan pleaded guilty on February 3, 2025, and was sentenced by the Court on May 5, 2025. ECF Nos. 127, 163. Panosyan pleaded guilty on June 23, 2025, and was sentenced by the Court on September 8, 2025. ECF Nos. 183, 218. Srapyan and Harutyunyan pleaded guilty on July 7, 2025, and are set for sentencing on October 6 and November 17, 2025, respectively. ECF Nos. 190, 191.

| Federal Health Care Offense with Loss of More than $1,000,000: | +2 | U.S.S.G. § 2B1.1(b)(7) |
| Sophisticated Means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Means of Identification: | +2 | U.S.S.G. § 2B1.1(b)(11)(C) |
| Transactional Money Laundering | +1 | U.S.S.G. § 2S1.1(b)(2) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1 |
| Zero-Point Offender Adjustment: | -2 | U.S.S.G. § 4C1.1 |
| Total: | **24** | |

### B.    Guidelines on Which the Parties Agree

Pursuant to the Plea Agreement (ECF No. 187, ¶ 14), the parties agree with Probation's Guidelines calculation with respect to (1) the base offense level, (2) loss amount, enhancements for (3) a federal health care offense and (4) means of identification, (5) the one-level increase for a money laundering offense, and (6) Esparza's acceptance of responsibility and zero-point offender status.

### 1.    Base Offense Level

Under U.S.S.G. § 2S1.1(a)(1), the base offense level is the underlying offense from which the laundered funds were derived.  Here the underlying offense is health care fraud in violation of 18 U.S.C. § 1347, which corresponds to U.S.S.G. § 2B1.1(a)(2) and a base offense level of **6**.  PSR ¶ 80.

### 2.    Loss Amount

Pursuant to U.S.S.G. § 2B1.1(b)(1), the base offense level is increased based upon the loss amount.  The parties agree that the loss amount for which Esparza should be held responsible is $1,825,012, corresponding to an adjustment of **16** levels under U.S.S.G. § 2B1.1(b)(1)(I).  PSR ¶ 82.

7

### 3.    Federal Health Care Offense

Pursuant to U.S.S.G. § 2SB.1(b)(7), the offense level is increased by **2** because Esparza was convicted of a federal health care offense involving a government health care program and a loss of more than $1,000,000.  PSR ¶ 83.

### 4.    Means of Identification

The parties and Probation agree that the two-level sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(11)(C)(i) applies.  *See* PSR ¶¶ 86-89.  Probation, however, applied this enhancement based on the Relevant Conduct guideline, U.S.S.G. § 1B1.3.  In fact, Esparza's own conduct in using I.S.'s name and identifying information to obtain a fake driver's license factually supports the enhancement, and there is no need to rely on Esparza's coschemers' conduct.

In January 2022, Fichidzhyan texted Esparza I.S.'s name and personal identifying information, including I.S.'s actual date of birth, to Esparza to be used on a false driver's license in I.S.'s name.  Exhibit C, Texts Between Fichidzhyan and Esparza.  Esparza then texted an individual who made false identification documents and arranged to have a driver's license made bearing I.S.'s name and the photograph that Fichidzhyan had sent.  Sept. 22 Pforr Decl. ¶ 6.

Thus, Esparza's offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification."  U.S.S.G. § 2B1.1(b)(11)(C)(i).

### 5.    Transactional Money Laundering

Under U.S.S.G. § 2S1.1(b)(2)(A), the offense level is increased by **1** because Esparza was convicted of transactional money laundering under 18 U.S.C. § 1957.  PSR ¶ 91.

8

6.    Acceptance of Responsibility and Zero-Point Offender

Under the Plea Agreement, Esparza receives a three-level reduction under U.S.S.G. § 3E1.1 for timely acceptance of responsibility.  PSR ¶ 103.  Esparza also appears to qualify for a two-level decrease under U.S.S.G. § 4C1.1 based on his zero-point criminal history.  *Id.* ¶¶ 104-106.

**C.    Disputed Guidelines**

In addition to the agreed upon Guidelines above, a two-level enhancement for Esparza's use of sophisticated means should be applied.  No adjustment should be made for a mitigating role because Esparza was deeply involved in this years-long scheme, and he cannot fairly be characterized as a "minor participant."

1.    Esparza Employed Sophisticated Means

A two-level enhancement for the use of sophisticated means is warranted if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C).  As explained further in the application notes, "sophisticated means" generally means "especially complex or especially intricate offense conduct," for example "fictitious entities" or "corporate shells."  U.S.S.G. § 2B1.1 cmt. n.9(B).  When a fraudulent scheme is carried out by a group of individuals, the defendant need not be "the mastermind in executing the conspiracy" for the application of the sophisticated means enhancement if the defendant "knew what was going on" and was a willing participant in furthering a sophisticated scheme.  *United States v. Terabelian*, 105 F.4th 1207, 1220 (9th Cir. 2024).

Esparza was involved in the hospice fraud from the beginning.  As early as August 2019, he received fraudulent proceeds from Healthy

9

Life.  Sept. 22 Pforr Decl. ¶ 14.  Esparza knew the types of services hospice care should include; he claimed to be a minister employed by Healthy Life in 2019.  *Id.* ¶ 4.  He was also present at the storefronts where Dynamic and House of Angels were supposedly in business — he knew there were no employees at those offices, no patient files, and no actual services being provided.  Nov. 27 Pforr Decl. ¶¶ 16, 23.

Beginning in about April 2021, Esparza was the owner of House of Angels, one of the Sham Hospices, and the sole signatory on the House of Angels bank account.  Plea Agreement ¶ 12; Pforr Decl. ¶ 13. Esparza repeatedly signed Medicare forms as the House of Angels CEO, *see* Exhibit E, continually creating the impression that House of Angels was providing hospice services and thereby perpetuating the fraud.  Faxes from other medical providers found during the search of the House of Angels office show that Esparza was aware that, because House of Angels was fraudulently billing for hospice services for Medicare beneficiaries, other medical providers that were actually providing needed health care services to those same beneficiaries could not get reimbursed.  Sept. 22 Pforr Decl. ¶ 9; Exhibit F, Communications to House of Angels from Other Medical Providers. Based on photographs obtained from one of Esparza's phones, it appears that Esparza had scripts of what to tell these medical providers when they contacted House of Angels.  Sept. 22 Pforr Decl. ¶¶ 11-12.  One of the scripts stated "This was a [sic] error in billing.  Our biller canceled the claim and you will be able to bill in 7 business days."  *Id*.  In another instance, when contacted by a surgery center whose legitimate claim had been denied because of the

10

hospice fraud, Fichidzhyan instructed Esparza via text to tell the surgery center "to bill us."  Sept. 22 Pforr Decl. ¶ 7.

In addition to the lies he told to Medicare and to health care providers, Esparza was deeply involved in the use of the Impersonated Identities in this scheme and served as a critical link to obtain false identification documents.  Not only did he work to obtain the fake driver's license for the Impersonated Identity I.S., on multiple occasions, Esparza paid the cell phone bill for the phone purportedly used by I.S.  *Id.* ¶¶ 5, 6; Plea Agreement ¶ 12.  Esparza also texted ID makers regarding false identification documents for two other Impersonated Identities, D.G. and A.M., in April 2020, and texted the same ID maker from whom he obtained the I.S. driver's license about obtaining additional false identification documents in August and September of 2022.  Sept. 22 Pforr Decl. ¶¶ 6, 11.

Esparza's home address was used as the address for multiple Impersonated Identities, as documentation found during searches in this case revealed.  *Id.* ¶ 8.  Esparza cannot claim that he was ignorant of the Impersonated Identities and their role in the scheme - when he was stopped by the Glendale police in 2020, he lied about I.P., the Impersonated Identity whose mail was coming to Esparza's residence.  *Id.* ¶ 10.  Esparza also received funds from multiple bank accounts for which the Impersonated Identities were the signatories — the accounts for Healthy Life, Prayer of Hope, and Dynamic — as well as receiving funds from an account in the name of one of the Impersonated Identities, D.G., for whom he had been involved in obtaining false identity documents.  *Id.* ¶¶ 11, 13-15; Exhibit D, Esparza Fraud Proceeds.

11

Esparza's actions carrying out a health care fraud scheme based on Impersonated Identities and Sham Hospices that were essentially fictitious — the hospices conducted no actual business — is exactly the type of crime for which the sophisticated means enhancement was intended.  The Ninth Circuit's recent decision in *United States v. Terabelian* is particularly instructive here.  105 F.4th 1207 (9th Cir. 2024).  As this Court will remember, the *Terabelian* fraud was carried out through the use of "synthetic identities," which were used to apply for fraudulent COVID-19 relief loans.  *Id*. at 1212.  A synthetic identity is a false identity created through the combination of personally identifiable information of real people with fictitious information.  *Id*.  Here, the government has referred to them as Impersonated Identities.

The sophisticated means enhancement in *Terabelian* was based on Terabelian's use of synthetic identities and the possession of a credit card in the name of one of the synthetic identities.  *Id*. at 1220.  In affirming the application of the enhancement, the Ninth Circuit noted that even when a defendant's actions "do not reveal 'exceptional brilliance,'" the use of the sophisticated means enhancement is appropriate if the steps taken "as a whole" show that the defendant "intentionally engaged in . . . conduct constituting sophisticated means."  *Id*. (citations omitted).  Terabelian's "intentional participation in the scheme to 'use . . . fictitious entities'" was "the kind of sophisticated means precisely contemplated by the Guidelines."  *Id.*

In light of the extensive evidence of his involvement in the scheme, Esparza's attempts to cast himself in the role of a mere

12

clerk are unsuccessful.  ECF No. 221 at 6-7.[2]  Esparza, like the defendant in *Terabelian*, may not have been the mastermind of the scheme, but he was fully enmeshed in the scheme and knowledgeable about it.  Esparza knew about the health care services that a hospice was supposed to provide (he lied and told a bank he was a minister for Healthy Life), and he knew that the Sham Hospices were not providing any such care (he was seen at the storefronts for two of the Sham Hospices, storefronts that contained no patient files).  Most importantly, Esparza knew that the scheme was being carried out through the use of the Impersonated Identities — he obtained false identification documents for them, paid their phone bills, and received money from accounts in their names and the names of the Sham Hospices.  Esparza lied for years, knowing that the Impersonated Identities were not in the United States running hospices and knowing that the hospices themselves were, in reality, fictitious entities

---

[2] Several of the assertions Esparza makes in his objections to the PSR are simply incorrect:

1) Esparza states that he did not control the House of Angels bank account, when in fact he was the sole signatory on the bank account, Nov. 27 Pforr Decl.¶ 20;

2) Esparza argues that he made just a "few thousand dollars a month" in salary, when in fact he controlled the $1.3 million in the House of Angels bank account and received nearly half a million more in the course of the scheme, Exhibit D;

3) Esparza claims that he never transferred funds from the bank account for the hospice that was under his name, but he pleaded guilty to transferring $90,000 from the House of Angels bank account to a car dealership to purchase a vehicle, Plea Agreement ¶ 12;

4) Esparza argues that his conduct was "almost entirely restricted" to answering phones and taking messages, when in fact he signed forms for Medicare, obtained documentation for the Impersonated Identities, received mail for the Impersonated Identities, and took the other steps described in this memorandum.

that existed only on paper and only to siphon money from Medicare. This is precisely the type of case where the defendant's use of sophisticated means, including the Impersonated Identities and the Sham Hospices, warrants the application of the sophisticated means enhancement.

### 2.   Esparza Was Not a Minor Participant

Under U.S.S.G. § 3B1.2, a defendant is eligible for a two-level reduction if he is a minor participant in the criminal activity, meaning he is less culpable than most participants.  U.S.S.G. § 3B1.2 cmt. n.5.  A defendant is eligible for a mitigating role adjustment only if he is substantially less culpable than an average participant in the criminal activity.  *Id.* cmt. n.3(A).

A defendant bears the burden of proving his entitlement to a mitigating role reduction by a preponderance of the evidence.  *United States v. Rosas*, 615 F.3d 1058, 1067 (9th Cir. 2010).  Esparza has not met, and cannot meet, that burden here.

In determining whether a mitigating role reduction applies, the court should consider at least five factors: "(i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (v) the degree to which the defendant stood to benefit from the criminal activity."  U.S.S.G. § 3B1.2, cmt. n.3(C).

14

To analyze whether a defendant is substantially less culpable than the average participant in an offense, district courts follow a three-step process. First, the court identifies anyone for whom there is "sufficient evidence of their participation in the overall scheme." *United States v. Dominguez-Caicedo*, 40 F.4th 938, 960, 965 (9th Cir. 2022). A defendant is compared against his co-participants and likely participants, not hypothetical or unknown participants. *Id.* at 961. Second, the court should calculate a rough average level of culpability for these individuals, considering the five factors identified in the Sentencing Guidelines note 3(c) and the degree to which each factor applies. *Id.* at 960; *United States v. Chichande*, 113 F.4th 913, 921 (2024). Third, the court must compare the defendant's culpability to the average. *Dominguez-Caicedo*, 40 F.4th at 960. Where a defendant is not substantially less culpable than the average scheme participant, he is not eligible for a mitigating role reduction. *Id.*

In this case, Esparza was indicted with four co-defendants. The government acknowledges that Fichidzhyan was the leader of the scheme, but the evidence shows that both Esparza and Srapyan, who participated in the health care fraud and money laundering, understood the full scope and structure of the criminal activity. Panosyan and Harutyunyan were charged only with the money laundering aspect of the scheme.

Esparza participated in organizing the criminal activity when he discussed specific Medicare beneficiaries with Fichidzhyan and maintained control over the House of Angels bank account. Esparza also appears to have served as a crucial link in obtaining false identification documents for the Impersonated Identities; the

15

individual who produced the identification documents communicated with Esparza in Spanish, and based on the investigation, none of Esparza's co-defendants spoke Spanish and therefore would not have been able to work with this individual to obtain the false identity documents.  Sept. 22 Pforr Decl. ¶ 6.

Esparza may not have exercised ultimate decision-making authority in the scheme, but this limitation does not make him less culpable than the average participant.  Esparza does not suggest that anyone besides Fichidzhyan had ultimate decision-making authority, and thus Esparza, Srapyan, Panosyan, and Harutyunyan are all similarly situated.

The nature and extent of Esparza's participation in the scheme precludes him from being considered a minor participant.  Esparza worked to advance the scheme, day in and day out, for years.  He physically went to the hospice storefronts, answered inquiries from medical providers whose legitimate billing was thwarted by the fraud, and obtained false identification documents and lied to the Glendale police to maintain the façade of the Impersonated Identities.

Finally, Esparza benefitted greatly from the criminal activity. He controlled the House of Angels bank account — he purchased a luxury vehicle using fraud proceeds from that account — and in addition, received hundreds of thousands of dollars from the scheme in his personal bank account.  Esparza's suggestion that he received "little personal gain," ECF No. 221 at 10, rings hollow when he pleaded guilty to personally controlling or receiving more than $1.8 million.

Esparza was not the ringleader of this scheme; the government has never claimed that he was.  But the law does not say that

everyone except the ringleader is a minor participant.  The law recognizes that there may be many participants in a jointly undertaken criminal activity and reserves a reduction for a mitigating role for those who are "substantially less culpable" than the average participant.  Esparza, an active member of the scheme for years, does not qualify.

The government agrees with the Probation Office and calculates Esparza's total offense level as **24,** which, together with a Criminal History Category I, corresponds with a Guidelines range of 51-63 months' imprisonment.  PSR ¶ 156.

**IV.   SECTION 3553(a) FACTORS**

In addition to the Sentencing Guidelines range, in imposing a sentence, the Court also considers the factors listed in 18 U.S.C. § 3553(a).  These include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, the need for adequate deterrence, and the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct.

The government respectfully requests that the Court sentence Esparza, consistent with the Sentencing Guidelines, to 63 months' imprisonment, followed by a three-year period of supervised release. A sentence of 63 months is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a) and reflects the nature and circumstances of the offense, history and characteristics of the defendant, and the need for adequate deterrence.

17

**A.    The Nature and Circumstances of Esparza's Extensive Fraud Warrants a 63-Month Guidelines Sentence**

The nature and circumstances of this offense support a sentence of 63 months' imprisonment.  *See* 18 U.S.C. § 3553(a)(1).  First, the scale of the scheme was massive.  Between 2019 and 2023, as a result of Esparza and his coschemers' false and fraudulent claims for hospice services that were neither medically necessary nor provided, Medicare paid the Sham Hospices nearly $16 million.  PSR ¶¶ 61-63. The scheme involved multiple Sham Hospices and multiple Impersonated Identities and was a brazen fraud in which the billed Medicare beneficiaries were not terminally ill, did not need hospice services, and no services of any kind were provided.

Second, Esparza was a key player ensuring the fraudulent scheme kept functioning day-to-day. He went to the storefront offices, paid the bill for the cell phone that I.S. was purportedly using, received faxes from medical providers who could not get paid by Medicare because of the fraud scheme, and discussed the individual Medicare beneficiaries who were being billed.  Esparza also personally signed multiple Medicare forms on behalf of House of Angels, one of the Sham Hospices.  And he received mail for the Impersonated Identities at his apartment and obtained a fake driver's license for the Impersonated Identity I.S.  Esparza may not have designed the scheme, but it would not have worked without him.

Third, Esparza controlled the $1.3 million in fraudulent proceeds that Medicare deposited into the House of Angels account and was paid hundreds of thousands more for his participation in the scheme.  *See* Exhibit D.

18

All of these factors about the nature and circumstances of Esparza's crimes favor a sentence consistent with the Guidelines of 63 months.

### B. Esparza's History and Characteristics Favor a 63-Month Guidelines Sentence

Participating in this fraud was a choice.  According to his presentence interview with Probation, Esparza currently supports himself through his own marketing company, Modern Marketing Solutions.  PSR ¶ 141.  In other words, according to Esparza, he is currently earning a living legally and now earns more per month in marketing ($5,000) than he did as the owner of House of Angels ($2,400 / month).  *Id.* ¶¶ 141-142.  The government, of course, contends that the hundreds of thousands of dollars Esparza collected in fraudulent proceeds, *see* Exhibit D, were more profitable for him than his marketing business.  But it is clear that Esparza chose to defraud Medicare out of simple greed — he made more money doing it.

Esparza's participation in the fraud was not a one-time lapse, nor was it a case of a low-level individual being taken advantage of by others.  For years he advanced the fraudulent scheme, knowing that Medicare was paying for nonexistent services and that legitimate medical providers might not be paid for services that Medicare beneficiaries actually needed as a result of his actions.  And when he was arrested in 2020 and had the opportunity to come clean and explain why he was in possession of mail addressed to an Impersonated Identity, Esparza did the exact opposite — he doubled down on the lie, claiming that I.P. was a friend who lived in the area when she was nothing of the sort.  Esparza's statements to the Glendale police were patently false and designed to mislead law enforcement in the

19

hopes of avoiding responsibility and continuing to use the Impersonated Identities.

Esparza chose, over and over again, to commit crimes that he knew were draining Medicare and potentially harming Medicare beneficiaries, and his history and characteristics reinforce the propriety of a 63-month prison sentence.[3]

### C.    A Sentence of 63 Months' Imprisonment Is Necessary to Deter Health Care Fraud and Related Money Laundering

Schemes like Esparza's and his coschemers' hospice fraud and money laundering threaten the viability of the Medicare programs by increasing costs and jeopardizing Medicare's ability to provide much-needed health care benefits to vulnerable populations, including the elderly and the disabled.  Deterrence, both general and specific, is critically needed to stem such fraud against Medicare.

Hospice fraud is a significant problem for the state and federal government in California and, in particular, Los Angeles County.  In 2023, nationwide Medicare hospice expenditures totaled $25.7 billion,[4] with more than $3 billion paid in California in 2020.[5] The State of California estimated 2019 Medicare overbilling for hospice in Los Angeles County at $105 million.[6]  The magnitude and particularity of the fraud to the Central District of California is

---

[3] While not dispositive, it is also worth noting that according to the PSR Esparza has a tattoo on his chest that says "federal nightmare," suggesting that a sentence that recognizes the seriousness of his crimes would promote his respect for the law and provide significant personal deterrence.  PSR ¶ 131.

[4] MedPAC, "March 2025 Report to Congress," at 267, *available at* https://www.medpac.gov/wp-content/uploads/2025/03/Mar25_MedPAC_Report_To_Congress_SEC-1.pdf.

[5] Auditor of the State of California, "California Hospice Licensure and Oversight," Report 2021-123 (March 2022), at 11, *available at* https://www.auditor.ca.gov/pdfs/reports/2021-123.pdf.

[6] *Id.* at 25.

evidenced by the fact that, as of 2019, Los Angeles County had 818 hospices, while the states of New York and Florida combined had only 87 hospices.[7]

The State of California has flagged that the fraud is becoming increasingly brash, as "networks of individual perpetrators in Los Angeles County are engaging in a large and organized effort to defraud the Medicare . . . hospice program[]."[8]  This is exactly what happened here.  A network of individuals, in which Esparza was a critical player, engaged in a large and organized effort to defraud Medicare and launder the fraud proceeds.  The Sham Hospices provided no legitimate hospice services, no patient care, and existed for the sole purpose of bilking Medicare for as many millions as they could before the perpetrators were caught.  Such fraud not only risks the viability of Medicare hospice programs as a whole but also potentially risks the lives of the beneficiaries whose identifying information is stolen and used in the schemes because their enrollment in hospice may result in their denial of necessary care by legitimate medical providers.  *See* Exhibit F.

Moreover, given that sophisticated schemes — like the instant scheme with multiple Sham Hospices, Impersonated Identities, shell companies, and bank accounts — are difficult to detect and prosecute, there is greater need for general deterrence.  *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties.").  "Fraud crimes like

---

[7] *Id.* at 20.

[8] *Id.* at iii.

21

those at issue here typically are calculated, and, as a result, are particularly amenable to general deterrence." *United States v. Thompson*, 130 F.4th 1158, 1167 (9th Cir. 2025). *See also United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (noting "the increased importance of general deterrence in white collar crime cases"); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence") (internal quotation marks omitted); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

Without serious consequences, criminals like Esparza will continue to benefit from stealing from Medicare and will continue to choose to commit fraud. The sentences in this case must show that crime does not pay.

To deter others from defrauding government health programs and to specifically deter Esparza from resuming a life in which fraud is his chosen source of income, a significant sentence of 63 months' imprisonment is warranted.

22

### D. A Guidelines Sentence of 63 Months' Imprisonment Avoids Unwarranted Sentencing Disparities Among Defendants

On May 5, this Court sentenced Petros Fichidzhyan to 144 months' imprisonment: 120 months on the healthcare fraud and money laundering counts to which Fichidzhyan pleaded, plus 24 months' imprisonment to run concurrently for his conviction for aggravated identity theft. ECF No. 164. On September 8, this Court sentenced Mihran Panosyan to 57 months' imprisonment for his role in laundering the proceeds of the hospice fraud. ECF No. 219.

The government acknowledges that Fichidzhyan was more culpable in the execution of this scheme than Esparza. But Esparza, like Panosyan, was not the leader but was nonetheless a vital participant in the scheme. Esparza's participation in both the health care fraud and the money laundering aspects of the scheme, and crucially his choice to lie to Medicare and medical providers for years, repeatedly choosing to break the law and perpetuate the scheme knowing that it could prevent Medicare from paying for the actual care that people needed, warrants a 63-month sentence.

In light of this, and to avoid unwarranted disparities among defendants who participated in the same scheme, the government submits that a sentence of 63 months' imprisonment for Esparza — that is, a sentence at the top of Esparza's Guidelines range, less than Fichidzhyan's sentence and slightly longer than Panosyan's, who was not charged with health care fraud — is appropriate.

## V. RESTITUTION

The government requests restitution in the amount of $1,825,012 to Medicare, which corresponds to the amount of fraud proceeds that Esparza personally controlled or received. *See* PSR ¶¶ 64, 169.

23

## VI.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant Juan Carlos Esparza to 63 months' imprisonment, followed by a three-year period of supervised release, a special assessment of $200 and order restitution of $1,825,012.